UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

JUAN ORLANDO HERNANDEZ,
    a/k/a "JOH,"
JUAN CARLOS BONILLA VALLADARES,
    a/k/a "Tigre," and
MAURICIO HERNANDEZ PINEDA,

      Defendants.

S4 15 Cr. 379 (PKC)
S7 15 Cr. 379 (PKC)
S8 15 Cr. 379 (PKC)

---

**THE GOVERNMENT'S OMNIBUS REPLY IN FURTHER SUPPORT OF THE GOVERNMENT'S MOTIONS *IN LIMINE* AND OPPOSITION TO DEFENDANT MAURICIO HERNDANDEZ PINEDA'S MOTIONS *IN LIMINE***


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007


Jacob H. Gutwillig
David J. Robles
Elinor L. Tarlow
Kyle A. Wirshba
Assistant United States Attorneys
    *Of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

    I. Evidence of Narcotics-Related Corruption Is Admissible as Direct Evidence and Pursuant to Rule 404(b) ......................................................................................................................... 3

    II. Electronic Communications by Central American Drug Traffickers Regarding Cocaine Bearing the Stamp "TH" Are Admissible.................................................................................. 9

    III. Evidence from Tony Hernandez's Cellphones Is Admissible ........................................... 13

    IV. Pineda's Motions *in Limine* for the Disclosure of Witness Statements Should be Denied 15

        A. Applicable Law ........................................................................................................ 16

        B. Discussion ................................................................................................................ 18

CONCLUSION..................................................................................................................... 24

# TABLE OF AUTHORITIES

**CASES**

*Boyette v. LeFevre*,
    246 F.3d 76 (2d Cir. 2001) ............................................................................. 20

*Brady v. Maryland*,
    373 U.S. 83 (1963) ................................................................................. passim

*California v. Green*,
    399 U.S. 149 (1970) .......................................................................................... 12

*Giglio v. United States*,
    405 U.S. 150 (1972) ....................................................................... 2, 17, 19, 23

*Kyles v. Whitley*,
    514 U.S. 419 (1995) .......................................................................................... 16

*United States v. Amato*,
    No. 03 Cr. 1382 (NGG), 2006 WL 1720402 (E.D.N.Y. 2006) ............................. 10

*United States v. Avellino*,
    136 F.3d 249 (2d Cir. 1998) ............................................................................. 20

*United States v. Bagley*,
    473 U.S. 667 (1985) .......................................................................................... 16

*United States v. Cabrera, et al.*,
    22 Cr. 10 (NRB), 2023 WL 4305023 (S.D.N.Y. 2023) ...................................... 19

*United States v. Cadet*,
    664 F.3d 27 (2d Cir. 2011) ................................................................................. 8

*United States v. Colon*,
    880 F.2d 650 (2d Cir. 1989) ............................................................................... 6

*United States v. Coppa*,
    267 F.3d 132 (2d Cir. 2001) ................................................................. 16, 17, 20

*United States v. Fasciana*,
    01 Cr. 58 (LTS), 2002 WL 31495995 (S.D.N.Y. 2022) ...................................... 20

*United States v. Geovanny Fuentes Ramirez*,
   S6 15 Cr. 379 (PKC) ............................................................................... 4

*United States v. Goode*,
   No. 16 Cr. 529 (NSR), 2018 WL 919928 (S.D.N.Y. 2018) ..................................... 18

*United States v. Jacques Dessange, Inc.*,
   No. 99 Cr. 1182, 2000 WL 280050 (S.D.N.Y. 2000) .......................................... 18

*United States v. Johnpoll*,
   739 F.2d 702 (2d Cir. 1984) ..................................................................... 11

*United States v. Juan Antonio Hernandez Alvarado*,
   S2 15 Cr. 379 (PKC) ............................................................................ 1, 4

*United States v. Juan Orlando Hernandez, et al.*,
   15 Cr. 379 (PKC) (S.D.N.Y. 2023) ......................................................... 17, 23

*United States v. Meregildo*,
   920 F. Supp. 2d 434 (S.D.N.Y. 2013) ........................................................... 16

*United States v. Miller*,
   No. 12 Cr. 368 (PAC), 2012 WL 4791992 (S.D.N.Y. 2012) .................................... 18

*United States v. Nixon*,
   418 U.S. 683 (1974) ............................................................................... 17

*United States v. Ortiz*,
   962 F. Supp. 2d 565 (S.D.N.Y. 2013) ........................................................... 12

*United States v. Ozsusamlar*,
   428 F. Supp. 2d 161 (S.D.N.Y. 2006) ........................................................ 6, 12

*United States v. Parker*,
   554 F.3d 230 (2d Cir. 2009) ..................................................................... 10

*United States v. Payne*,
   63 F.3d 1200 (2d Cir. 1995) ..................................................................... 21

*United States v. Pipola*,
   83 F.3d 556 (2d Cir. 1996) ........................................................................ 7

*United States v. Pitre,*
    960 F.2d 1112 (2d Cir. 1992) ................................................................. 6

*United States v. Riccardi,*
    620 F. App'x 11 (2d Cir. 2015) ............................................................ 15

*United States v. Robinson,*
    702 F.3d 22 (2d Cir. 2012) ..................................................................... 5

*United States v. Rodriguez,*
    No. 19 Cr. 779 (AKH), 2020 WL 5819503 (S.D.N.Y. 2020) ............... 17

*United States v. Ruiz,*
    06 Cr. 228 (NRB), 2010 WL 2541322 (S.D.N.Y. 2010) ...................... 19

*United States v. Salameh,*
    152 F.3d 88 (2d Cir. 1988) ................................................................... 14

*United States v. Saleh,*
    813 F. App'x 678 (2d Cir. 2020) .......................................................... 10

*United States v. Salguero Portillo,*
    No. 15 Cr. 379 (PKC) (S.D.N.Y. 2021) ............................................... 17

*United States v. Savoca,*
    335 F. Supp. 2d 385 (S.D.N.Y. 2004) .................................................. 12

*United States v. Sergentakis,*
    No. 05 CR 230 (JFK), 2005 WL 1994014 (S.D.N.Y. 2005) ............... 19

*United States v. Velasquez,*
    No. S9 96 Cr. 126 (JFK), 1997 WL 414132 (S.D.N.Y. 1997) ............ 18

*United States v. Viera,*
    No. 14 Cr. 83 (ER), 2015 WL 171848 (S.D.N.Y. 2015) ...................... 18

**STATUTES**

18 U.S.C. § 3500 ................................................................................................ passim

**RULES**

Federal Rule of Criminal Procedure 16 ................................................................ 22
Federal Rule of Evidence 403 .............................................................................. 11
Federal Rule of Evidence 404 ........................................................................ passim
Federal Rule of Evidence 801 ........................................................................ 13, 14
Federal Rule of Evidence 804 ........................................................................ 13, 15

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in advance of the February 5, 2024 trial of defendants Juan Orlando Hernandez ("Juan Orlando"), Mauricio Hernandez Pineda ("Pineda"), and Juan Carlos Bonilla Valladares ("Bonilla"). The Government writes in reply to Pineda's and Bonilla's oppositions to the Governments motions *in limine*, *see* Dkt. Nos. 565, 578, and in response to Pineda's motions *in limine*, *see* Dkt. 569. Pineda and Bonilla oppose the Government's requests to admit at trial (i) evidence of narcotics-related corruption in Honduras; (ii) electronic communications between Central American drug traffickers who were the defendants' co-conspirators; and (iii) electronic evidence from cellphones belonging to their co-conspirator Juan Antonio Hernandez Alvarado ("Tony Hernandez"), including photographs of firearms, narcotics proceeds, and other co-conspirators. As described in the Government's motions *in limine*, this evidence is admissible as both direct evidence and, in the alternative, under Federal Rule of Evidence 404 (b). *See* Dkt. Nos. 487, 554. The Court has already admitted these categories of evidence at prior trials, which involved the same conspiracies and charges, and the defendants have failed to identify any distinguishing basis for precluding such evidence here.

The Court also should grant the Government's additional motions *in limine* that the defendants did not oppose. *See* Dkt. Nos. 487, 554. In particular, the Government moved to admit at trial: (i) statements made to cooperating witnesses by the defendants and former drug traffickers, politicians, and members of the Honduran National Police ("HNP") who were the defendants' co-conspirators, *see* Dkt. 487 at 18-26; Dkt. 554 at 35-60; (ii) statements made by Honduran officials, including Juan Orlando, in the presence of a witness, *see* Dkt. 554 at 63-68; (iii) evidence of Bonilla's participation in a drug-related murder, *see id*. at 68-72; (iv) evidence of drug ledgers

seized from a co-conspirator, *see id*. at 72-74; and (v) electronic evidence belonging to co-conspirators, including a cooperating witness, *see id*. at 85-95. For the reasons set forth in the Government's prior briefing, the Government respectfully submits that the Court should grant the Government's unopposed motions *in limine*.

The Court also should deny Pineda's motions *in limine*. *See* Dkt. 569. Pineda moves the Court to compel the Government to immediately produce certain witness statements and other evidence that may constitute exculpatory or impeachment material under *Brady v. Maryland*, 373 U.S. 83 (1963). In support of this request, Pineda cites to purported inconsistencies in the material that the Government has produced pursuant to 18 U.S.C. § 3500 for an anticipated Government witness. The examples cited by Pineda are not exculpatory information required to have been produced under *Brady*. In any event, the Government is aware of its disclosure obligations and will continue to fulfill them. The Government has already provided, and will continue to provide, 3500 and *Giglio* material for testifying and non-testifying witnesses months in advance of trial, and, as to most witnesses, well before the deadline of 60 days prior to the February 5, 2024 trial to provide such material. Nothing more is required.

Accordingly, and as set forth below, the Government respectfully submits that the Court should grant the Government's motions *in limine* and deny Pineda's motions *in limine*.[1]

---

[1] Pineda and Bonilla also request permission to supplement their oppositions, and in the case of Pineda, to file any additional motions *in limine*, upon the Government's production of supplemental expert notice, marked exhibits, and Rule 3500 materials. *See* Dkt. Nos. 565, 569, and 578. The Government respectfully requests the opportunity to respond to any such motions.

<u>**ARGUMENT**</u>

**I. Evidence of Narcotics-Related Corruption Is Admissible as Direct Evidence and Pursuant to Rule 404(b)**

Pineda and Bonilla first argue that evidence of narcotics-related corruption in Honduras, including that they were involved in paying or receiving bribes, is inadmissible at trial. *See* Dkt. 565 at 2-11; Dkt. 578 at 2-11. As set forth in the Government's motions *in limine*, the Government intends to offer evidence that Juan Orlando, Bonilla, and Pineda abused their high-ranking positions within the Honduran government to protect drug shipments and certain drug traffickers. *See* Dkt. 487 at 13-18; Dkt. 554 at 30-35. That evidence is part and parcel of the charged conduct. The defendants and their co-conspirators were able to operate with impunity in Honduras for years because senior political and law enforcement officials—including the defendants—ensured that ton-quantity shipments of cocaine would safely make their way through Honduras on their way to the United States without being intercepted by law enforcement and without their traffickers being arrested.

The Government expects that multiple cooperating witnesses will testify that Pineda and Bonilla helped facilitate the safe passage of the conspiracy's cocaine in exchange for drug proceeds as well as senior positions within the HNP, which they then used to protect the conspiracy's operations. For example, and as is set forth in greater detail in the Government's motions *in limine*, the Government expects that cooperating witnesses will testify that Pineda and Bonilla were paid bribes to ensure that co-conspirator Tony Hernandez's cocaine shipments were protected as those shipments were transported across Honduras. *See* Dkt. 487 at 15; Dkt. 554 at 32-33. Pineda and Bonilla also each worked directly with Juan Orlando and Tony Hernandez, both of whom received and used drug proceeds from the conspiracy to rise to political power in Honduras and relied upon

Pineda and Bonilla to ensure that drug loads were protected and that the traffickers benefited financially. *See id*. Put simply, Pineda's and Bonilla's roles in the charged conspiracies were to abuse their positions of power, including by receiving bribes, to ensure that the narcotics conspiracy was protected and could achieve its goals.

The Court admitted similar evidence of narcotics-related corruption at the trials of co-conspirators Tony Hernandez and Geovanny Fuentes Ramirez ("Fuentes Ramirez"). *See United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC), Dkt. No. 85, Sept. 13, 2019 Final Pretrial Conference Tr. at 4-5; *United States v. Geovanny Fuentes Ramirez*, S6 15 Cr. 379 (PKC), Dkt. No. 251, Feb. 12, 2021 Final Pretrial Conference Tr. at 7-8. The admission of such evidence was proper, and, as described in the Government's motions *in limine*, the rationale that drove the Court's decisions in those cases applies with equal force here. Tellingly, neither Pineda nor Bonilla even acknowledges that the Court admitted evidence of narcotics-related corruption in those prior trials. That is because there is no meaningful way to distinguish admitting such evidence in those cases while precluding the evidence here.

Pineda and Bonilla instead argue that such evidence has no bearing on the charged crimes and would be unfairly prejudicial. Those arguments are meritless. Pineda and Bonilla assert that evidence of bribe payments and other corruption is not relevant to whether they "participated in a conspiracy to traffic narcotics." Dkt. 565 at 8; Dkt. 578 at 5. Pineda further argues that such corruption is not part of the same transaction or series of transactions that formed the basis for the charged conduct and evidence of that corruption does not "address any disputed aspect of the relationships underlying the conspiracy." Dkt. 565 at 8. But as described above, evidence of narcotics-related corruption, and in particular, bribes paid to Pineda and Bonilla, is inextricably

intertwined with the charged narcotics and firearms conspiracies: the defendants were paid bribes to protect the conspiracy's drug loads, and did so through the use of firearms, including machineguns and destructive devices. The corruption-related evidence additionally explains why the co-conspirators came together, how they operated, and why they were able to continue committing crimes of this magnitude unabated for years. The conspiracy's members relied upon protection from HNP members, like Pineda and Bonilla, to facilitate their drug trafficking. Evidence of bribes to those high-ranking officials to protect their drug operations thus goes to the core of the relationship between the conspiracy's members.

Pineda and Bonilla also argue that such evidence should be precluded because the testimony of the Government's cooperating witnesses, if accepted, would be sufficient to convict them of the charged crimes without eliciting evidence of narcotics-related corruption. *See* Dkt. 565 at 8; Dkt. 578 at 5-6, 10. That argument misses the point. The question is not whether some limited presentation of evidence may be sufficient for the Government to meet its burden of proof; rather, the law makes clear that where, as here, evidence is inextricably intertwined with the charged conduct, it constitutes direct evidence and may be offered for that purpose. *See United States v. Robinson*, 702 F.3d 22, 36-37 (2d Cir. 2012).

In the alternative, Pineda and Bonilla contend that evidence of narcotics-related corruption is inadmissible under Rule 404(b). In support, they argue that there are "no legally relevant or material issues for which reference to the uncharged political corruption is probative." Dkt. 565 at 9; *see also* Dkt. 578 at 8 ("[T]he government has not provided an issue that is relevant to which the uncharged offenses apply."). Because narcotics-related corruption is direct evidence, however, the Court need not reach that argument. Nonetheless, as explained in the Government's motions

*in limine*, evidence of narcotics-related corruption is separately admissible under Rule 404(b) because it is probative of the defendants' intent and motive. *See* Dkt. 487 at 17; Dkt. 554 at 34.

With respect to intent, it is well-established that "[a] defendant's knowledge and intent are in issue unless the defendant has expressed with sufficient clarity a decision not to dispute that element of the offense." *See United States v. Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989). To take "intent out of a case, 'a defendant must make some statement to the court of sufficient clarity to indicate that the issue will not be disputed.'" *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992) (quoting *Colon*, 880 F.2d at 659). "A defendant may do so either 'by putting forward a particular theory of defense or by specifically offering to stipulate.'" *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 168 (S.D.N.Y. 2006) (quoting *Colon*, 880 F.2d at 657).

Here, the Government is required to prove that Pineda and Bonilla knowingly and intentionally participated in the charged narcotics conspiracy. *See* Tony Hernandez Trial Tr. at 1234 (charging the jury that the Government "must prove beyond a reasonable doubt that the defendant knowingly and intentionally entered into the [narcotics] conspiracy"). To date, there has been no indication that any defendant will concede the intent element of the charged crimes. As such, to the extent evidence of narcotics-related corruption does not constitute direct evidence (which it does), the Government is entitled to rely upon that evidence to establish that the defendants had the requisite intent to commit the charged crimes. Indeed, evidence establishing that the defendants received bribes in exchange for their protection of drug loads is plainly probative of their intent to participate in that same conspiracy.

Similarly, evidence that the defendants were paid bribes to protect drug loads is highly probative of their motives for joining and participating in the conspiracy. Evidence of bribe

payments to Pineda and Bonilla helps demonstrate why they were willing to abuse their positions of power and participate in the conspiracy in the first place. Indeed, without evidence of those payments, it would make little sense to a jury why high-ranking members of the HNP would be protecting massive drug loads belonging to the criminals that they were supposed to be investigating and arresting. As described above, those bribes and the associated narcotics-related corruption show how the conspiracy operated and the relationship between its members, making it highly probative. *See United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (evidence is admissible under Rule 404(b) "to explain how a criminal relationship developed" and "help the jury understand the basis for the co-conspirators' relationship of mutual trust").

Pineda's and Bonilla's argument that evidence of narcotics-related corruption "is only probative as to whether [they] paid or received bribes, but has no probative value to whether [they] participated in the alleged conspiracy by providing information or security for narcotics trafficking activities" is thus inconsistent with common sense and applicable law. Dkt. 565 at 9-10; *see also* Dkt. 578 at 11. The payment of bribes to Pineda and Bonilla, and the narcotics-related corruption that helped place and keep them in positions of power within the HNP, speaks volumes about their intent and motives for joining and participating in the charged conspiracy. Such evidence is therefore properly admitted for those purposes under Rule 404(b).

Finally, Pineda and Bonilla argue that evidence of narcotics-related corruption is unduly prejudicial and should be excluded under Rule 403. Their arguments on this point are equally meritless. As described in the Government's motions *in limine*, evidence of narcotics-related corruption is no more prejudicial than other evidence that will be elicited, such as evidence that members of the conspiracy, including Bonilla, participated in murders and facilitated the shipment

of multi-ton quantities of cocaine under the protection of heavily armed military and law enforcement personnel. *See* Dkt. 554 at 35. To the contrary, and as described above, evidence of the defendants' narcotics-related corruption—for example, their accepting bribes to protect drug loads—illustrates how the conspiracy operated. There is thus no serious risk that evidence of bribe payments and other narcotics-related corruption that formed part of that conspiracy will inflame or confuse the jury. In any event, evidence that "massive" or "exorbitant" amounts of money were being exchanged among government officials and drug traffickers, *see* Dkt. 578 at 10; Dkt. 565 at 10, is not unduly prejudicial given that the defendants themselves, along with their coconspirators, were the intended beneficiaries of those payments in connection with their roles in the charged conspiracy. The evidence will establish that the defendants chose to participate in a massive cocaine importation conspiracy that was made possible through widespread narcotics-related corruption from which they benefitted. Evidence of that corruption is thus highly probative and is not substantially outweighed by the risk of unfair prejudice.[2]

Accordingly, evidence of narcotics-related corruption is properly admitted as direct evidence or, in the alternative, under Rule 404(b).

---

[2] Moreover, if the Court were to admit such evidence under Rule 404(b) and not as direct evidence, a limiting instruction would further reduce the risk of any potential for unfair prejudice. *See United States v. Cadet*, 664 F.3d 27, 33 (2d Cir. 2011) (careful limiting instruction sufficient to address potential prejudice from admission of evidence under Rule 404(b)).

## II. Electronic Communications by Central American Drug Traffickers Regarding Cocaine Bearing the Stamp "TH" Are Admissible

Pineda and Bonilla also oppose the admission of electronic communications between two Central American drug traffickers ("CC-5" and "CC-6")[3] discussing the purchase of hundreds of kilograms of cocaine that were marked with a stamp bearing Tony Hernandez's initials, "TH." During the exchange, CC-5 and CC-6 exchanged a photograph of one of the "TH"-stamped kilograms. As described in the Government's motions *in limine*, these messages are admissible both as statements against penal interest under Rule 804(b)(3) and, separately, as co-conspirator statements under Rule 801(d)(2). *See* Dkt. 487 at 28-34; Dkt. 554 at 74-80. Indeed, prior to the Tony Hernandez trial, the Government moved *in limine* to admit these communications under these same theories of admissibility, *see* Dkt. 78 at 38-42, and they were admitted into evidence at that trial, *see* Tony Hernandez Trial Tr. at 149-50, 521-25.[4] Pineda and Bonilla offer no explanation as to why the outcome should be any different here.

Pineda and Bonilla instead argue that the communications between the Central American drug traffickers are inadmissible because they do not fall under either hearsay exception identified by the Government. Pineda and Bonilla first argue that, without knowing the identities of the individuals who are exchanging the messages, the Court cannot determine whether they are the defendants' co-conspirators or whether the statements were made in furtherance of the conspiracy

---

[3] These individuals were also referred to as CC-5 and CC-6 in the Government's May 1, 2023 motions *in limine*, *see* Dkt. 554, but were referred to as "CC-4" and "CC-5" in the Government's October 28, 2022 motions *in limine*, *see* Dkt. 487. The Government will continue to refer to them as CC-5 and CC-6 in this brief, as it did in its May 1, 2023 brief.

[4] The photograph of the kilogram bearing the "TH" stamp also was admitted into evidence at the Fuentes Ramirez trial on redirect examination. *See* Fuentes Ramirez Trial Tr. 993-94.

under Rule 801(d)(2)(E).  *See* Dkt. 565 at  12-13; Dkt. 578 at 13.  To admit an out-of-court statement under Rule 801(d)(2)(E), a district court must only find by a preponderance of the evidence "(1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy." *United States v. Saleh*, 813 F. App'x 678, 681 (2d Cir. 2020).  "[K]nowledge of the declarant's identity is not a requirement as long as the trial court can reach a determination that the declarant is a member of the conspiracy." *United States v. Amato*, No. 03 Cr. 1382 (NGG), 2006 WL 1720402, at *3 (E.D.N.Y. June 20, 2006).

Here, as described in the Government's motions *in limine*, the communications at issue meet the requirements for admissibility under Rule 801(d)(2)(E).  Those communications concern a drug transaction for hundreds of kilograms of cocaine in San Pedro Sula, Honduras and include a photograph of a kilogram of that cocaine specifically marked with Tony Hernandez's initials. The communications on their face reflect that they are between downstream purchasers of Tony Hernandez's cocaine, and therefore between individuals who were part of the same distribution chain of the charged narcotics conspiracy in which Pineda and Bonilla participated.  *See, e.g.*, *United States v. Parker*, 554 F.3d 230, 238 (2d Cir. 2009) (describing a "chain conspiracy" in which "[o]ne who establishes a continuing business of selling drugs in large, wholesale quantities knows that the success of his selling business depends on the ability of his customers to resell to others, who in turn will resell to still others, until the product ultimately is sold to retail consumers").  As described above and in the Government's motions *in limine*, cooperator testimony will establish that both Pineda and Bonilla helped facilitate drug shipments for Tony Hernandez, and that they were active participants in the charged conspiracy around the time these

messages were exchanged in 2016. Thus, the Government respectfully submits that, like Tony Hernandez, Pineda and Bonilla were members of the same drug conspiracy as the Central American drug traffickers. Communications between those individuals about purchasing hundreds of kilograms of the conspiracy's cocaine for further distribution are thus properly admitted as co-conspirator statements under Rule 801(d)(2)(E), even if their specific identities are unknown.[5]

Pineda and Bonilla also argue that the communications are inadmissible as statements against penal interest under Rule 804(b)(3). In doing so, they do not contest that the communications subject the participants to criminal liability or that they bear the requisite indicia of reliability. Instead, Pineda and Bonilla argue solely that the Government cannot show that the Central American drug traffickers exchanging those communications are unavailable. *See* Dkt. 565 at 13-14; Dkt. 578 at 13-14. Their arguments are meritless. A declarant is unavailable for purposes of Rule 804 if the declarant is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1), or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony," *id.* 804(a)(5)(B). As the Second Circuit has recognized, "unavailability is to be determined according to the practical standard of whether under the circumstances the Government has made a good-faith effort to produce the witness to testify at trial." *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984);

---

[5] Moreover, as described below and in the Government's motions *in limine*, a prosecution team based in another district believes that it has identified at least one of these participants. *See* Dkt. 554 at 70, n. 20; Dkt. 487 at 31 n. 6.

*California v. Green*, 399 U.S. 149, 189 n. 22 (1970) (Harlan, J., concurring) ("The lengths to which the prosecution must go to produce a witness before it may offer evidence of an extra-judicial declaration is a question of reasonableness.").

As described in the Government's motions *in limine*, the prosecution team responsible for the wiretap yielding these messages has taken steps to identify CC-5 and CC-6. That prosecution team, which is based in another district, believes that it has identified one of the participants in the exchange but not the other, has charged that individual, and is seeking to effect his provisional arrest in order to pursue extradition. *See* Dkt. 554 at 76-77, n. 20. The individual, however, remains at large in an unknown location in Central America. CC-5 and CC-6 therefore currently remain unavailable as witnesses. They both appear to be located overseas, beyond the United States' subpoena power, and likely would invoke the Fifth Amendment with respect to these communications if given the opportunity. *See* Dkt. 487 at 31 n. 6; Dkt. 554 at 76 n. 20. Moreover, despite law enforcement's efforts to locate them, their precise locations overseas are unknown, making it practically impossible to even attempt to request their testimony at this time.

Pineda and Bonilla argue, without any legal support, that such a proffer is insufficient to establish CC-5's and CC-6's unavailability. But Pineda and Bonilla cite no legal support for that argument, which is contrary to decisions in this District and the facts present in this case. *United States v. Ortiz*, 962 F. Supp. 2d 565, 573 (S.D.N.Y. 2013) (finding witness unavailable where the witness was located outside United States at time of trial); *Ozsusamlar*, 428 F. Supp. 2d at 176 (finding witness unavailable where government took some steps to locate witness who lived abroad and could not be identified); *see also United States v. Savoca*, 335 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) ("[T]he 'unavailability' component is established by the fact that [the declarant] is expected

to invoke his Fifth Amendment privilege.")

Accordingly, the 2016 communications between the Central American drug traffickers about purchasing cocaine from the charged narcotics conspiracy are admissible.

## III. Evidence from Tony Hernandez's Cellphones Is Admissible

As described in the Government's motions *in limine*, the Government seeks to admit evidence from two cellphones seized from Tony Hernandez in connection with his November 23, 2018 arrest. These devices contain, among other things, photographs of firearms, including of automatic weapons; United States currency that trial evidence will establish was consistent with drug proceeds; contact information for co-conspirators; and photographs of co-conspirators. This evidence was admitted at Tony Hernandez's trial and is also properly admitted here. *See* Dkt. 487 at 34-39; Dkt. 554 at 80-84.

Pineda and Bonilla oppose the introduction of this evidence on the grounds that it is too prejudicial and would only serve to inflame the jury. *See* Dkt. 565 at 15-16; Dkt. 578 at 12. To start, Pineda and Bonilla argue that evidence from Tony Hernandez's cellphones, such as photographs of firearms, have no bearing on their own culpability. *See id.* But as described in the Government's motions *in limine*, the fact that Tony Hernandez, a central member of this conspiracy who worked with Pineda and Bonilla, had photographs of firearms is probative of each of the defendants' involvement in a conspiracy to carry firearms during and in relation to the drug trafficking crime with which they are charged. That evidence demonstrates that members of the conspiracy in fact possessed and had access to firearms. The fact that the photographs were taken from Tony Hernandez's cellphones—as opposed to any devices belonging to Pineda or Bonilla— is irrelevant, because once a defendant is a member of a conspiracy, "all the evidence admitted to

prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1988). Indeed, evidence from one of Tony Hernandez's cellphones—an image of a CZ Scorpion assault rifle with the inscription, "Juan Orlando Hernandez, Presidente De La Republica"—also was admitted at the Fuentes Ramirez trial. *See* Fuentes Ramirez Trial Tr. at 97, 1005-06.

Nor is this evidence unduly prejudicial because, as explained in the Government's motions *in limine*, cooperating witnesses will testify about the ways in which members of the conspiracy used these types of weapons to protect drug shipments, including with and at the direction of Pineda and Bonilla. Indeed, trial testimony will establish that both Bonilla and Pineda provided heavily armed security for drug shipments and that Pineda also carried an assault rifle with him to drug trafficking meetings, including the 2013 meeting in which El Chapo offered Tony Hernandez a $1 million bribe for Juan Orlando's presidential campaign in exchange for continued protection of cocaine loads in Honduras. Photographs that demonstrate that members of the conspiracy, including Tony Hernandez, in fact possessed these weapons are thus highly probative and do not create a risk of unfair prejudice.

Pineda also argues that photographs of firearms on Tony Hernandez's cellphone are cumulative because evidence of the conspiracy's use of firearms "can be elicited through cooperator testimony and the pictures do not offer any new information." *See* Dkt. 565 at 15-16. The visual depiction of firearms used by the conspiracy, however, is distinct from cooperator testimony describing firearms. Such evidence will uniquely assist the jury in assessing the charges. Moreover, the Government anticipates that Pineda will seek to undermine the credibility of the Government's cooperating witnesses by calling into question, among other things, their knowledge

that members of the conspiracy, including Pineda, were using and carrying firearms in connection with their drug trafficking. Photographs of such firearms from a co-conspirator's electronic devices corroborate the testimony of those witnesses and are therefore plainly relevant and admissible. *See, e.g.*, *United States v. Riccardi*, 620 F. App'x 11, 15 (2d Cir. 2015) ("The district court acted well within its discretion in concluding that the guns and ammunition were not being offered to prove propensity but, rather, as direct evidence of the charged robbery crimes as well as corroboration for [a cooperating witness's] testimony that Riccardi had provided him with the guns he used to commit the robbery.").

Accordingly, for the reasons set forth in the Government's motions *in limine* and above, the Government respectfully submits that electronic evidence from Tony Hernandez's cellphones is admissible against the defendants.

## IV. Pineda's Motions *in Limine* for the Disclosure of Witness Statements Should be Denied

Pineda also moves the Court for the immediate and broad disclosure of certain witness material, which Pineda asserts constitutes material that the Government is required to produce pursuant to *Brady v. Maryland*, 373 U.S.C. 83 (1963). *See* Dkt. 569 at 3-13. In support of that request, Pineda cites to purported inconsistencies that he identified in the 3500 material produced to date for one of the Government's anticipated trial witnesses, referred to in the Government's October 28, 2022 motions *in limine* as "CW-3." *See* Dkt. 487.

The Government understands its obligations to provide the defense with any *Brady* materials and will do so promptly if it comes into possession of any such materials. But the purported inconsistencies identified in CW-3's 3500 material—which, at most, constitute potential impeachment material that is the proper subject of cross-examination—are not exculpatory and do

not rise to the level of a *Brady* disclosure. Those materials do not, as defense counsel asserts, require the Government to make any immediate additional disclosures. The Government has already produced significant 3500 material for Government witnesses and, as directed by the Court, will produce the remainder of such materials at least 60 days in advance of trial. The Government's rolling, early production of these materials—which, as the Court recognized at the June 29, 2023 conference, was made well in advance of trial—gives defense counsel ample time to make effective use of that material. Accordingly, Pineda's motions *in limine* should be denied.

### A. Applicable Law

Under *Brady v. Maryland*, 373 U.S.C. 83 (1963), and its progeny, the Government must affirmatively disclose to the defense evidence that is favorable to the defendant, known to the Government's prosecution team, and material to guilt or punishment. *See Kyles v. Whitley*, 514 U.S. 419, 432 (1995). The *Brady* rule is grounded in the constitutional right to due process, and its purpose is "not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675 (1985). In other words, *Brady* exists solely to ensure that a defendant receives a fair trial and does not otherwise modify the scope of the Government's discovery obligations. *United States v. Meregildo*, 920 F. Supp. 2d 434, 439–40 (S.D.N.Y. 2013) (summarizing Supreme Court jurisprudence holding that "*Brady* is not a rule of discovery—it is a remedial rule"). Indeed, so long as exculpatory material is provided to the defense with sufficient time to allow for its effective use at trial, there is no *Brady* violation. *See, e.g.*, *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001) ("[W]e have never interpreted due process of law as requiring more than that *Brady* material must be disclosed in time for its effective use at trial[.]").

The Jencks Act, 18 U.S.C. § 3500, covers disclosure of statements or reports made by Government witnesses, and the rule mandates that such materials not be the subject of discovery or inspection "until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). As this Court has noted:

> The point is [*Jencks* Act material is] not intended as discovery material. Now, this Court, as many U.S. district courts around the country, has developed the custom or practice of inviting the government to produce 3500 material in advance of trial, so that the trial is not interrupted with the need to read it and review it; not investigate it, it's not – that's not the purpose of the 3500 material. And in fact, some – not you, of course, but some counsel have so turned it on their head, that if the government gives them the 3500 material sooner than the Thursday before jury selection on Monday, they come in wanting a continuance of the trial so they can investigate. That's not the purpose of the 3500 material.

*United States v. Salguero Portillo*, No. 15 Cr. 379 (PKC), Dkt. 389, at 12 (S.D.N.Y. Nov. 5, 2021); *see also United States v. Juan Orlando Hernandez, et al.*, 15 Cr. 379 (PKC), June 29, 2013 Tr. at 16 (S.D.N.Y. June 29, 2023) ("[Y]ou don't get [3500 material] until you're already with an empaneled trial.").

More specifically, pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), the Government must produce materials that impeach the credibility of Government witnesses with enough time for its effective use by the defense. *United States v. Rodriguez*, No. 19 Cr. 779 (AKH), 2020 WL 5819503, at *10 (S.D.N.Y. Sept. 30, 2020) (citing *United States v. Coppa*, 267 F.3d 132, 142-46 (2d Cir. 2001)). "Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *United States v. Nixon*, 418 U.S. 683, 701 (1974). Moreover, except to the extent the statements are exculpatory, a district court "is without authority to order 'pretrial disclosure of witness statements.'" *United States v. Goode*, No.

16 Cr. 529 (NSR), 2018 WL 919928, at *16 (S.D.N.Y. Feb. 15, 2018) (quoting *Coppa*, 267 F.3d at 145). Accordingly, the production of *Giglio* material "shortly prior to the commencement of trial" is "customary in this district." *United States v. Miller*, No. 12 Cr. 368 (PAC), 2012 WL 4791992, at *2 (S.D.N.Y. Oct. 9, 2012); *see also United States v. Viera*, No. 14 Cr. 83 (ER), 2015 WL 171848, at *6 (S.D.N.Y. Jan. 14, 2015) (approving the Government's proposed disclosure of *Giglio* material for confidential source one week before trial). There are sound reasons for this rule. For example, unlike discovery, "impeachment material has a more narrow, specific use—to attack the credibility of a witness on cross-examination. No extended pretrial investigation and preparation of such material is necessary for its effective use." *United States v. Velasquez*, No. S9 96 Cr. 126 (JFK), 1997 WL 414132, at *6 (S.D.N.Y. July 23, 1997); *see also United States v. Jacques Dessange, Inc.*, No. 99 Cr. 1182 (DLC), 2000 WL 280050, at *9 (S.D.N.Y. Mar. 14, 2000) (impeachment material "does not ordinarily require any independent investigation in order to use it effectively at trial").

## B. Discussion

Pineda's request for the immediate disclosure of additional witness statements and evidence should be denied. *See* Dkt. 569 at 3-12. In support of his request, Pineda asserts that he identified certain statements in CW-3's 3500 material that implicated the Government's disclosure obligations under *Brady*. As described further below, those arguments are meritless.

As an initial matter, Pineda has and will continue to receive witness statements well in advance of trial. In February 2021, the Government began making voluminous Rule 16 discovery productions to Pineda that included, among other categories of evidence, the transcripts from the 2019 trial of co-conspirator Tony Hernandez, at which three cooperating witnesses—each of

whom the Government also expects to call as a witness at Pineda's trial—testified about Pineda's involvement in the charged conspiracy. In early May 2023, the Government began producing 3500 and *Giglio* material for testifying and non-testifying witnesses, including for CW-3 and Amilcar Alexander Ardon ("Alex Ardon"), both of whom previously testified about Pineda at Tony Hernandez's trial. Consistent with the Court's June 29, 2023 order, and absent seeking any extension for particular witnesses, the Government will produce the remainder of the 3500 material 60 days before trial is scheduled to begin. The Government further confirms that it understands its disclosure obligations and will continue to comply with those obligations in a timely manner. Pineda's request, therefore, should be denied. *See, e.g.*, *United States v. Cabrera, et al.*, 22 Cr. 10 (NRB), 2023 WL 4305023, at *5-6 (S.D.N.Y. June 29, 2023) (denying request for early disclosure of witness material based on "the Government's good faith assurances that it understands, has complied with, and will continue to comply with its disclosure obligations"); *United States v. Ruiz*, 06 Cr. 228 (NRB), 2010 WL 2541322, at *1 (S.D.N.Y. June 17, 2010) (same); *United States v. Sergentakis*, No. 05 CR 230 (JFK), 2005 WL 1994014, at *1-2 (S.D.N.Y. Aug. 17, 2005) ("The Government response . . . that '[c]onsistent with the regular practice in this District, the Government intends to make Section 3500 material available to the defense at the same time as impeachment material, [and that] in order to avoid any delay in the trial, the Government will produce such material sufficiently in advance of each Government witness's testimony' . . . is more than adequate.").

In any event, Pineda's arguments in support of his request for the immediate and broad disclosure of witness materials are baseless. Although Pineda frames his request as premised on a potential *Brady* violation, he acknowledges that there has been no *Brady* violation. *See* Dkt. 569

at 9.  A Court's *Brady* analysis is retrospective, and Pineda does not attempt to demonstrate, nor could he, that the result of any proceeding would be different.  The Government has made voluminous productions to date and trial is not scheduled to begin until February 5, 2024.  *See, e.g.*, *United States v. Fasciana*, 01 Cr. 58 (LTS), 2002 WL 31495995, at *1 (S.D.N.Y. Nov. 6, 2022) (denying request for the disclosure of *Brady* material and noting that "*Brady* does not establish any general right to pretrial discovery of potentially exculpatory evidence"); *see also United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (holding that a *Brady* analysis is fundamentally retrospective, requiring an assessment of whether the result of the proceeding would have been different).

Moreover, undisclosed impeachment evidence is generally only "material" for purposes of a post-hoc *Brady* analysis "where the witness in question supplied the only evidence linking the defendant to the crime."  *United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998); *see also Boyette v. LeFevre*, 246 F.3d 76, 93 (2d Cir. 2001) (undisclosed impeachment evidence was material where witness's identification testimony was the only evidence against the defendant).  That is not the case here, where multiple cooperating witnesses will be testifying about Pineda's role in the charged conspiracy.

Nevertheless, Pineda argues that the purported inconsistencies he identifies in the proffer notes of a single Government witness—CW-3—constitute *Brady* material.  Pineda is wrong.  The purported inconsistencies in CW-3's proffer notes amount to nothing more than clarifications that resulted in additional *inculpatory* details about Pineda.  For example, Pineda argues that CW-3 did not provide Pineda's full name or certain details about Pineda's involvement in protecting CW-3's drug shipments during CW-3's initial proffers, although Pineda admits that CW-3 subsequently

proffered such information. *See* Dkt. 569 at 6-7. Pineda further points to the fact that CW-3

clarified, during a proffer in August 2019, that CW-3 had confused Pineda with another individual

in certain prior proffers, but confirmed that both individuals had provided Tony Hernandez with

information to facilitate his drug trafficking. Finally, Pineda argues that CW-3 proffered

inconsistently about a payment that he sent to Pineda in approximately 2010 to stop an

investigation into one of CW-3's drug trafficking partners, including the amount of that payment

and that the investigation focused on the partner's worker. *See* Dkt. 569 at 8. But there is nothing

inconsistent or exculpatory about the fact that CW-3 advised the Government of additional,

clarifying information during his subsequent proffers. The fact that, for example, CW-3 recalled

additional details about Pineda's role in the conspiracy, including a payment that CW-3 made to

Pineda that occurred almost thirteen years ago, is not surprising. Nor is any of the clarifying

information exculpatory: CW-3 has consistently said that Pineda was involved in the conspiracy

at issue, including that he paid Pineda to exploit his position in the HNP in order to end an

investigation into another drug trafficker.

To the extent the defense believes that CW-3 fabricated information over time and then

testified falsely under oath, they are free to pursue that line of cross-examination at trial. But there

is no basis to claim that CW-3's initial proffers, which did not include an exhaustive recitation of

CW-3's knowledge about Pineda's crimes, "were so inconsistent as to implicate the Government's

*Brady* obligations" when CW-3 later provided additional information about Pineda's role in the

charged conspiracy. Dkt. 569 at 5. That is particularly true given that other witnesses corroborate

CW-3's account. *See, e.g.*, *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) (recognizing

that impeachment evidence may be immaterial in the context of a *Brady* motion where the

witness's testimony is substantially corroborated or is "but a fraction of the evidence" supporting the defendant's guilt).

At bottom, the examples that Pineda has identified in support of his motion, to the extent they may be characterized as inconsistencies, are simply grounds for potential impeachment that the defense is free to explore on cross-examination. But they do not support, much less give rise to, the relief Pineda seeks in his motion for the immediate disclosure of additional witness materials. As described above, the defendants will receive production of 3500 materials for the Government's witnesses at least 60 days before trial, absent any extension for particular witnesses sought by the Government. Even if any similar purported inconsistencies existed in the other witnesses' notes, that timing will permit for similar and standard cross-examination of witnesses about prior statements to the Government.

Tellingly, it appears that Pineda is simply seeking the immediate production of additional witness statements as a means to investigate the subject matter contained therein. *See* Dkt. 569 at 10 ("In this critical pre-trial period, for Mr. Hernandez Pineda to have an adequate opportunity to properly examine the evidence against him and investigate, he should be informed of any and all such favorable evidence immediately."); *see also id*. at 11 ("Delayed disclosure of impeachment evidence this close to trial could limit or deny defense attempts to adequately investigate such evidence."). That is improper. Indeed, at the June 29, 2023 pretrial conference in this case, the Court specifically reminded defense counsel that "the whole notion that I just read the 3500 material and it's given me new leads in discovery is not what 3500 material is all about. Because in the view of the framers of the statute, you don't get [3500 material] until you're already with an empaneled trial." *United States v. Juan Orlando Hernandez, et al.*, 15 Cr. 379 (PKC), June 29,

2013 Tr. at 16 (S.D.N.Y. June 29 , 2023).  The Court should reject Pineda's attempt to do an end run around well-established law concerning the pretrial disclosure of § 3500 and *Giglio* material. Pineda's request for the immediate disclosure of additional witness material—which, as described above, while couched in a purported *Brady* claim, is nothing more than a thinly veiled attempt to obtain even earlier disclosure of § 3500 and *Giglio* material for investigative purposes—should therefore be denied.

Pineda's request for the Government to identify specific witness statements or other evidence within the discovery and 3500 materials produced to the defense that may constitute exculpatory or impeachment evidence is also meritless.  *See* Dkt. 569 at 13.  As described above, the Government has far exceeded its disclosure obligations by beginning to produce § 3500 and *Giglio* material months in advance of trial, and will continue to do so in a timely manner.  The defense thus has ample time to make effective use of those materials.  Nothing more is required under the law.

Accordingly, Pineda's motions *in limine* should be denied.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should grant

the relief requested herein.

Dated:  New York, New York
        July 7, 2023

                                    Respectfully submitted,

                                    DAMIAN WILLIAMS

                                    United States Attorney for the
                                    Southern District of New York

                          By:      _____/s/_____
                                    Jacob H. Gutwillig
                                    David J. Robles
                                    Elinor L. Tarlow
                                    Kyle A. Wirshba
                                    Assistant United States Attorneys
                                    212-637-2215 / 2550 / 1036 / 2493

Cc:     Defense Counsel
        (Via ECF & Email)